UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 07-27 (RBW) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALLEN G. LOVE | : | |

### GOVERNMENT'S MOTION FOR GUIDELINES CREDIT AND MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves the Court, pursuant to § 3E1.1(b)(2) of the Sentencing Guidelines, to adjust the defendant's offense level down one level reflecting the defendant's early plea of guilty in this matter, which permitted the government to avoid preparing for trial and permitted the court to allocate its resources efficiently.  The United States also submits this memorandum in aid of sentencing.

**I.     BACKGROUND**

The defendant was charged in a two-count superseding information with Transportation or Shipping Material Involving Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(1) and 2256, and Possession of Material Involving Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(5) and 2256.  On September 4, 2007, the defendant pled guilty to count one: Transportation or Shipping Material Involving Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(1) and 2256, and admitted to the relevant conduct of possessing material involving child pornography.[1]  At that time the defendant admitted to the following:

---

[1] The possession of material involving child pornography occurred in the Northern District of Illinois, Eastern Division.

On Thursday, October 19, 2006, Metropolitan Police Detective Timothy Palchak was acting in an undercover capacity as part of a multi-jurisdictional Internet Crimes Against Children Task Force. Detective Palchak was operating out of a satellite office in Washington, DC. Detective Palchak entered an incest chat room (incesttaboochat) using the undercover screen name of "James." Using that screen name, Detective Palchak met and had a brief conversation with an individual using the screen name "Al" who asked to see a picture of "James'" ten year-old daughter. Al added "James" to his MSN Messenger account. Al was using the email address cowboy1955.50@hotmail.com. Detective Palchak, posing as "James," was using an undercover hotmail account.

After the initial meeting in the incesttaboochat chat room, Al initiated a private chat with "James" on MSN. This private chat continued intermittently from October 19, 2006, until December 14, 2006. Detective Palchak, posing as "James," sent to Al via the internet a picture of a small young child wearing a bathing suit with a panda bear on front of the bathing suit. Detective Palchak, posing as "James," told Al that the child in the photograph was "James'" 10 year-old daughter. Al told "James," "I would love to fuck her." Al asked "James" if "James" could send some nude pictures of the ten year-old daughter.

Al also asked "James" if he would bring his daughter to Chicago so that Al could have sex with her and get her pregnant. Al told "James" that Al could meet "James" at a hotel near Al's house so Al could have sex with "James'" ten year-old daughter.

During the course of the private chats, Al described himself as a 51 year-old male living west of Chicago with his mother. Using MSN Messenger, Al sent "James" via the internet approximately four images of children under the age of ten engaged in sexually explicit conduct.

These images were received by Detective Palchak in Washington, DC. Al also sent two short movie clips to "James" via MSN Messenger. One movie clip depicted a naked prepubescent child masturbating. The second clip depicted a sobbing prepubescent child being forcibly raped by an adult male. These movies were received by Detective Palchak in Washington, DC. The images and movie clips received from Al were taken to the National Center for Missing and Exploited Children (NCMEC) for analysis. The images were compared with NCMEC's Child Recognition & Identification System (CRIS). The analysis resulted in two of the images being identified as known juvenile, (i.e. under the age of 18), victims of child sexual abuse.

     Detective Palchak subpoenaed the subscriber information for email address cowboy1955.50@hotmail.com and for the IP address associated with that email address. The subpoena response revealed an account holder's name of Russ Love, with an address of 117 North Mill Street, Cedarville, Illinois 61013. Investigation of this address revealed that Allen G. Love, with a date of birth of October 3, 1955, lived at this address.

     On January 25, 2007, agents from the Federal Bureau of Investigation, with the assistance of the Stephenson County Sheriff's Department, executed a search warrant at 117 North Mill Street, Cedarville, Illinois. Allen G. Love was present at that location during the execution of the search warrant. Five computers were seized during the execution of the search warrant.

     On January 25, 2007, FBI Agents interviewed Allen G. Love. Love told the agents that he knew they were at his home because of his online activities relating to child pornography. He acknowledged use of the email address cowboy1955.50@hotmail.om. Love said that he built most of the computers found at 117 North Mill Street, Cedarville, Illinois.

     Love stated that he had one laptop computer which he uses to access the internet, and one

desktop computer which he uses to access the internet. Love admitted to chatting on-line with people in an incest taboo chat room, and he admitted to trading images of child pornography with people whom he met in the chat room. Love also admitted to utilizing the website www.hello.com, and stated that he received images of child pornography through this website, and may have sent images of child pornography to others through this website. Love said that he became interested in child pornography approximately 5 years ago, and that he has regularly traded images of child pornography on-line since that time. Love stated that the last time he traded images of child pornography on-line was approximately two weeks prior to the January 25, 2007, execution of the search warrant.

FBI Agents searched Love's computers, where they located over 600 images of child pornography, including:

- 0142.jpg: an image depicting a nude female toddler being vaginally penetrated by the penis of an adult male; and

- 0150.jpg: an image depicting a nude female infant being vaginally penetrated by an adult male's tongue; and

- 0266.jpg: an image of what appears to depict the genitals of a minor female being penetrated by a foreign object.

The images located on Love's various computers during the FBI agents' search were taken to the National Center for Missing and Exploited Children (NCMEC), where they were compared with NCMEC's Child Recognition & Identification System (CRIS). The analysis resulted in over 245 of the images being identified as known minors, (i.e. under age 18).

Love used a computer for the possession, transmission, and distribution of the child pornography he possessed. Furthermore, some of the images of child pornography possessed and

distributed by Love involved a prepubescent minor or a minor who had not attained the age of 12 years. Finally, some of the images and video clips that the defendant possessed and distributed portrayed sadistic or masochistic conduct or other depictions of violence.

## II.     SENTENCING CALCULATION

### A     Statutory Minimums and Maximums

Pursuant to 18 United States Code § 2252A, Transportation or Shipping Material Involving Child Pornography carries a minimum sentence of 5 years imprisonment and a maximum sentence of 20 years imprisonment.

### B.     Sentencing Guidelines Calculation

The Guidelines calculation utilized in the Presentence Report ("PSR") calculates the defendant's total offense level at 39. See PSR ¶ 41. This calculation contemplates a three level downward adjustment for acceptance of responsibility, and the following enhancements: two levels pursuant to U.S.S.G. § 2G2.2(b)(2) because the material involved a prepubescent minor, four levels pursuant to U.S.S.G. § 2G2.2(b)(4) because the material involved portrays sadistic or masochistic conduct or other depictions of violence, two levels pursuant to U.S.S.G. § 2G2.2(b)(6) because a computer was used to facilitate this offense, and five levels pursuant to U.S.S.G. § 2G2.2(b)(7)(D) because of the number of images involved. This calculation also contemplates a seven level enhancement pursuant to U.S.S.G. § 2G2.2(b)(3)(E) under the theory that the material was distributed with the intent to persuade, induce, entice, coerce, or facilitate the travel of the minor to engage in prohibited sexual conduct. See PSR ¶ 31. The defendant objects to this enhancement. The government did not include this enhancement in the plea agreement. As such, the government calculates the offense level without this enhancement,

which leaves the defendant's total offense level at 32. The PSR calculates the defendant's criminal history as Category I. See PSR ¶ 46. Therefore, the PSR calculates the guideline range for the defendant at 262 to 327 months. See PSR ¶ 76. However, as noted above, based upon the plea agreement, the government's calculations do not apply the seven level enhancement under U.S.S.G. § 2G2.2(b)(3)(E). Accordingly, the government calculates the defendant's guideline range as 121 to 151 months of imprisonment.

### III. GOVERNMENT'S RECOMMENDATIONS

#### A. Acceptance of Responsibility

The government agrees that the defendant's base offense level should be decreased by three points pursuant to Section 3E1.1 of the Sentencing Guidelines. He entered a guilty plea early enough in the proceedings to avoid the government's having to prepare for trial, and he appears to have met the requirements of Section 3E1.1 with respect to cooperating in the pre-sentence investigation. Accordingly, the government is moving the Court to grant the additional one level decrease in base offense level provided for in that Guideline provision.

#### B. Application of the Federal Guidelines post-Booker and Rita

Pursuant to the plea agreement, it is the government's position that the Court should impose a sentence at the low end of the guidelines range. In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. Section 3553(b)(1). Booker, 125 S. Ct. at 756-57. However, the Court expressly refused to invalidate the Guidelines in their entirety.

Id. at 764.  To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime.  Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines.  See 18 U.S.C. Section 3554(c)(2).  The sentence will then be subject to review by the court of appeals for "reasonableness."  Booker, 125 S. Ct. at 766.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines.  See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing).  "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  Booker at 767 (citing 18 U.S.C. Sections 3553(a)(4), (5) (Supp. 2004)).

In Rita v. United States, 127 S. Ct. 2456 (2007), the Court recently reiterated its position with respect to the Sentencing Guidelines.  The Court stated that the court of appeals may apply a presumption of reasonableness to a within-Guidelines sentence.  Id. at 2467.  The Court also stated, "[i]n our view, however, the presumption, even if it increases the likelihood that the judge, not the jury, will find sentencing facts, does not violate the Sixth Amendment."  Id. (Internal quotation marks omitted).  In this light – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – a sentence within the Guidelines, while not required,

accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences. Booker, 125 S. Ct. at 766.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing. Such characteristics, which are articulated in 18 U.S.C. Section 3553(a), include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [and] . . . (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . .

Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history. See, e.g., Booker, 125 S. Ct. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); Id. at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); Id. at 783

(dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); Id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity."). Since the Guidelines currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guidelines range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines. Such a sentence will now be reviewed instead for its "reasonableness." See id. at 764. Nevertheless, the Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. Section 3553(a) -- provide the most concrete yardstick against which to measure what would be unreasonable. Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, but Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals for reasonableness review. See 18 U.S.C. Section 3553(c) (mandating consideration of the Guidelines); 18 U.S.C. Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); 18 U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); 18 U.S.C. Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to

provide a required statement of reasons in the judgment and commitment order).

In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for guideline sentencing. Therefore, the government respectfully recommends that the Court sentence the defendant within the appropriate Federal Guidelines range.

    C.    <u>Basis for Government's Sentencing Recommendation</u>

The defendant has received a number of significant benefits from this plea, and all the leniency he should receive is encompassed in the concessions already made by the government. The defendant received a three point decrease in his offense level as a result of his acceptance of responsibility, and the United States Attorney's Office for the District of Columbia plans to dismiss the remaining count in the superceding indictment, Possession of Material Involving Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(5) and 2256. Furthermore, the original indictment contained an additional charge of Transportation or Shipping Material Involving Child Pornography, in violation of 18 U.S.C. 2252A(a)(1) and 2256, which was not charged in the superceding indictment. Had the defendant been convicted of the additional transportation count in the initial indictment, he would have faced an additional mandatory minimum sentence of five years incarceration. Moreover, the United States Attorney's Office for the Northern District of Illinois - Eastern Division, agreed not to prosecute the defendant for Possession of Material Involving Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(5) and 2256. Had the defendant been convicted of this charge, the defendant would have faced an additional sentence, which may well have been imposed consecutively to whatever sentence this Court imposes.

The defendant's actions in amassing an extensive library of child pornography fueled an industry that victimizes children throughout the world. The serious punishment recommended by the United States Sentencing Commission reflects Congressional concerns that consumers of child pornography, such as the defendant, create the market that causes producers of child pornography to kidnap, drug, and otherwise coerce the young children who are subjects of this ugly contraband.

The Ninth Circuit has articulated that "commercial child pornography" (images obtained from the Internet, just like those possessed by this defendant) is the industry targeted by Congress; moreover, the most effective method of eradicating the industry is to punish the ultimate consumer. United States v. Adams, 343 F.3d 1024, 1034 (9th Cir. 2003).

> Th[e] legislative history leads us to three observations: (1) Congress determined that child pornography is a multi-million dollar industry in which sexually explicit depictions of children are bought, sold, and traded interstate; (2) Congress decided to "stamp out" the market for child pornography by criminalizing the production, distribution, receipt, *and possession* of child pornography; and (3) Congress thought it could strike a blow to the industry by proscribing possession of child pornography "because those who possess and view child pornography encourage its continual production and distribution."

Id. at 1032, citing 136 Cong. Rec. at S4730 (emphasis in original). This Ninth Circuit panel stressed the national interest in punishing consumers, because "possession of commercial child pornography [whether the possession resulted from inter- or intrastate sale, trade, or dissemination] substantially affects the national market for child pornography." Id. at 1034; see also United States v. Rodia, 194 F.3d 465, 477 (3d Cir. 1999) (Polaroid photographs of "naked boys in various sexually explicit poses" does indeed fall within federal reach, because

11

"possession of 'home grown' pornography may well stimulate a further interest in pornography that immediately or eventually animates demand for interstate pornography").  The defendant's pursuit of these materials does indeed victimize children, since throughout the world, real children are forced or tricked into the degradation that is child pornography, for the mere gratification of adults like this defendant.  Moreover, because the Internet has become the distribution medium of the photographs, the degradation of these children is permanent, continuous, and impossible to eradicate. As the mother of one of the victims whose image was found in the defendant's child pornography library noted:

> We have no way of knowing how many pedophiles used the pictures of [the victim] being tortured and degraded as an opportunity for personal gratification. . . .
>
> If I had my way, each and every image of my daughter's sufferings would be burned.  Then she would no longer have to worry about those images being used to further hurt or humiliate her.  But as it is, there are those who have no shred of decency, and continue to copy and pass on these pictures.  Each person who callously passes on those sickening pictures is exposing my daughter to further shame and humiliation.  As long as this continues, the pictures will always be out there.
>
> My child dreams of accomplishing great things in her life.  She sees herself one day becoming a famous movie star, or president, or both.  Whenever I think about this, I am overcome with fury at those who keep these pictures alive, always waiting to be exploited in the future by the unscrupulous to cause further pain. . . .
>
> I can find no words to express . . . my scorn for any attempt to minimize the responsibility by feeble claims that the crime was 'victimless.'  My daughter is a real person.  She was horribly victimized to provide this source of 'entertainment.'  She is exploited anew each and every time an image of her suffering is copied, traded or sold.  While the crime is clearly conscienceless, it is hardly 'victimless.'

Victim impact statement from "Jan_Feb" series.[2]

Clearly, the defendant here fueled the national and international market for child pornography.[3] As such, the defendant's punishment should reflect the impact of his actions on the child pornography industry, and on the true victims, the children who were subjected to the illegal sexual abuse documented in the many photographs and videos in the defendant's collection. And the victims cannot, and should not, be considered simply in the abstract. They are real, flesh and blood victims of terrible crimes. They have names. They have pets, hobbies, families, and dreams. It is the ultimate insult that all of the victims, whether rescued and identified or not, are left with a terrible burden to carry for the rest of their lives: the knowledge that not only were they victimized by the predators who used the victims to create pornographic images, but that these images remain in circulation, and are viewed again and again and again

Indeed, the child victims of pornography will be forced to live with the horrible and depraved sexual acts they were forced to commit for the rest of their lives:

> The trauma of sexual abuse on a child is different from such childhood traumas as experiencing the divorce of one's parents or even being the victim of physical abuse. . . . [F]our traumagenic dynamics – traumatic sexualization, betrayal, powerlessness, and stigmatization – form the core of the psychological injury inflicted by abuse. They alter children's cognitive and emotional orientation to the world, and create trauma by distorting children's self-concept, world view, and affective capacities.

---

[2] The Victim Impact Statements referenced in this memorandum were provided to the Court and defense counsel on November 28, 2007.

[3] In fact, according to the reports provided by the National Center for Missing and Exploited Children's Child Recognition & Identification System, images of victims from thirteen foreign countries and at least thirteen different states were found in the defendant's vast library of child pornography.

> First, a child who is sexually abused is shaped in a developmentally inappropriate and interpersonally dysfunctional way, emerging with (1) inappropriate repertoires of sexual behavior, (2) confusions and misconceptions about his or her sexual identity and the role of sex in affectionate relationships, and (3) unusual emotional associations with sexual activities.
>
> Second, a child who is sexually abused by someone on whom he or she was vitally dependent experiences betrayal by (1) the perpetrator and (2) family members who are not sexually abusing the child but are unable or even unwilling to believe the child, thereby ignoring the child's cry for help. Moreover, child-victims who experience betrayal suffer from an intense need to regain trust and security, manifested in extreme dependency and clinging. As adults, they suffer from impaired judgment about the trustworthiness of other people or even experience hostility and anger towards personal relationships. Furthermore, anger stemming from betrayal may lead to aggressive, hostile or delinquent behavior as a way of protecting the self from future harm or as a way of retaliating against the initial abuse.
>
> Third, powerlessness occurs in sexual abuse when a child's territory and body space are repeatedly invaded against the child's will. Force and threat are not necessary for a child to feel powerless – the mere realization that he or she is trapped, combined with the fear of the consequences of disclosing his or her participation in sexual activity, can create a sense of powerlessness. Nightmares, phobias, hypervigilance, clinging behavior, and somatic complaints related to anxiety have been repeatedly documented among sexually abused children. As adults, the effects of powerlessness can include the impairment of a person's sense of efficacy and coping skills. . . .
>
> Fourth, stigmatization occurs when sexually abused children incorporate negative connotations related to their sexual experiences. Child-victims may feel isolated and may gravitate to various stigmatized levels of society, thereby becoming involved in drug or alcohol abuse, criminal activity, prostitution, extreme forms of self- destructive behavior, and suicide attempts.

Lydia W. Lee, Note, Child Pornography Prevention Act of 1996: Confronting the Challenges of Virtual Reality, 8 SOUTHERN CALIFORNIA INTERDISCIPLINARY LAW JOURNAL 639, 662-64 (1999)

(quotation marks and footnotes omitted) (summarizing findings set forth in David Finkelhor & Angela Browne, The Traumatic Impact of Child Sexual Abuse: A Conceptualization, 55 AMERICAN JOURNAL OF ORTHOPSYCHIATRY 530, 531-36 (1985)).

In this case, the Court does not need to rely on this abstract statement about the repercussions of the sexual abuse of children, and specifically, the trauma imposed by child pornography. Instead, the Court can rely on one of the actual victims whose image was found in the defendant's library of child pornography. Her voice can be heard by the Court, in the form of a victim impact statement. In this compelling statement the victim notes:

> When I was told how many people have viewed these images and videos I thought my pulse would stop. Thinking about all those sick perverts viewing my body being ravished and hurt like that makes me feel like I was raped by each and every one of them. I was so young and so helpless feeling. It terrifies me that people enjoy viewing things like this. Every time I think about it, my whole body goes ice cold and tears well up in my eyes. I can't even think about it most of the time. It hurts too much.
>
> Each person who has found enjoyment in these sick images needs to be brought to justice and kept away from other people because there is something seriously wrong with them. They are dangerous and even though I don't know them, they are hurting me still. They have exploited me in the most horrible way.

Victim Impact Statement from "Vicky."

### V.     CONCLUSION

Wherefore, the government respectfully requests that the Court sentence the defendant to 121 months of incarceration, to be followed by a lifetime of supervised release, with the following special conditions:

1)     Lifetime registration as a sex offender.

15

2) Substance abuse treatment.

3) The defendant shall not possess or use a computer that has access to any on-line computer service at any location, including his place of employment, without the prior written approval of the probation office. "On-line computer service" includes, but is not limited to, any Internet service provider, bulletin board system, or other public or private computer network.

4) The defendant shall submit to periodic unannounced examinations of defendant's computer by the probation office.

5) The defendant shall not possess or use any data encryption technique or program.

6) The defendant shall maintain a daily log of all addresses accessed by way of any computer, other than those authorized for employment, and shall make the log available to the probation office for review.

7) The defendant shall consent to third party disclosure regarding computer related restrictions to any employer or potential employer.

8) The defendant shall not engage in employment, consulting, or associate in any way with children as a profession for the duration of his supervision.

9) The defendant shall not participate in any volunteer activity that involves contact with minors.

10) The defendant shall participate in mental health treatment specifically related to sexual offender therapy.

11) The defendant shall not associate with any known sex offender.

12) The defendant shall not reside with a child under the age of 18 without the express written approval of the minor's legal guardian and the written permission of the Court.

        Respectfully submitted,

        JEFFREY TAYLOR
        United States Attorney

        **Catherine K. Connelly**
        Assistant United States Attorney
        Major Crimes Section, Mass. Bar No. 649430
        555 4th Street, N.W. #4844
        Washington, DC 20001
        Phone: 616-3384
        Fax: 353-9414

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 07-27 (RBW)** |
| | : | |
| v. | : | |
| | : | |
| **ALLEN G. LOVE** | : | |

## ORDER

WHEREUPON, having considered the Government's Motion for Guidelines Credit, and the record before the court, it is hereby

**ORDERED**, that the Government's motion is hereby GRANTED.

_____
Reggie B. Walton
United States District Judge

cc:

Catherine K. Connelly
Assistant United States Attorney
555 4th Street, NW
Washington, D.C. 20530

Tony Miles
Assistant Federal Public Defender
625 Indiana Avenue, NW
Suite 550
Washington, DC 20004